

JUDGE CROTTY    15 CV 00649

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEXANDER KAPLIN,<br><br>                Plaintiff,<br><br>v.<br><br>ANTHONY BUENDIA,<br><br>                Defendant. | Civil Action No. _____<br><br>COMPLAINT<br><br>**Jury Trial Demanded** |

RECEIVED JAN 29 2015 U.S.D.C. S.D. N.Y. CASHIERS

Plaintiff, Alexander Kaplin, by and through his attorneys at Clinton, Brook & Peed, for his Complaint against Defendant Anthony Buendia ("Buendia") states as follows:

## NATURE OF THE ACTION

1. This action arises out of the wrongful acts that Buendia committed while he was a member and employee of SEG Capital LLC. The action seeks damages for Buendia's Breach of Contract, Breach of Fiduciary Duty, Tortious Interference with Prospective Economic Advantage and Unjust Enrichment.

## PARTIES

2. Plaintiff, Alexander Kaplin, is a citizen of Florida, resident in Miami-Dade County. At all relevant times Mr. Kaplin was an Investing Member of SEG Capital, LLC ("SEG"), a registered broker-dealer specializing in trading investment funds and other products. SEG was a New York limited liability company with its main place of business at 2 Rector Street, New York, NY 10006.

3.  Defendant, Anthony Buendia, is a citizen of the state of Massachusetts, residing at 80 Trapelo Road, Lincoln, Massachusetts 01733. Buendia was a Trading Member of SEG, serving as SEG's Head of Trading and Risk Manager from on or about April 15, 2009 to on or about October 27, 2010. During that time Buendia worked out of SEG's New York office

4.  On June 1, 2014, SEG assigned and transferred "any and all claims, causes of actions [sic], demands, rights, and interests, of whatever kind and nature, arising out of or related to the Wrongful Acts" committed by Buendia to Plaintiff Alexander Kaplin. The assignment agreement was signed by Daniel Segal, SEG Managing Member, on behalf of SEG.

## JURISDICTION AND VENUE

5.  This Court has subject matter jurisdiction under 28 U.S.C. §1332(a)(1) because the case is between citizens of different states, and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

6.  Venue is proper in this district, pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to the present claims occurred in this judicial district.

## FACTS COMMON TO ALL COUNTS

### Buendia's Relationship with SEG

7.  Prior to April, 2009, SEG was a registered broker-dealer specializing in trading domestic exchange-traded funds ("ETFs").

8.  As of 2009, Buendia was regarded as an expert in ETFs. He had been Chief Operating Officer for one of the leading market maker firms, where he built and operated the second largest ETF trading desk in the U.S.; he was a recipient of various ETF-related awards, including Best ETF-Market Maker Award.

11.     On or about April 15, 2009, SEG and Buendia reached an agreement for Buendia to join SEG as a Lead Trading Member/Head of Trading, in part because of his expertise in trading international ETFs.

12.     The relationship between Buendia and SEG was governed by the Supplemental Trading Member Agreement (the "Trading Member Agreement," attached hereto as Exhibit A) and SEG's Second Amended and Restated Operating Agreement (the "Operating Agreement," attached hereto as Exhibit B) (collectively, the "Agreements").

13.     The Trading Member Agreement provided that Buendia was entitled to fifty percent of the Net Trading Profits he earned for SEG, and a monthly advance of $10,000.00 against his future share of the Net Trading Profits.

14.     The Trading Member Agreement required Buendia to pay compensation to any Trading Members Buendia brought to SEG out of his share of the Net Trading Profits.

15.     Pursuant to the Trading Member Agreement, Buendia was responsible, among other things, for establishing, building and operating the SEG trading desk.

16.     In addition to hiring Buendia, SEG hired seven of Buendia's associates ("Buendia's Associates"); two of Buendia's Associates joined SEG as Trading Members.

17.     To support Buendia's trading activities, SEG gave Buendia access to SEG Trading Accounts.

18.     Buendia was permitted to use the Trading Accounts to trade in listed securities, ETFs, options and their respective hedges.

19.     Pursuant to the Trading Member Agreement, Buendia was required to adhere to trading limits established by SEG.

20. With respect to ETFs, SEG's trading limit was set at a maximum of $5 million in any single ETF. Moreover, any such position was required to be hedged.

21. These trading limits were discussed in weekly meetings of SEG Members on the regular basis.

22. From January to October, 2010, SEG regularly paid Buendia his $10,000 monthly advances.

23. SEG also made direct advances to the two Trading Members, whom Buendia brought to SEG, since Buendia failed to pay their compensation.

24. From January through October, 2010, SEG advanced a total of $78,134 to these Trading Members.

25. Up until October 2010, Buendia never deviated from the trading parameters set by SEG without authorization.

26. However, on October 14, 2010 Buendia, without SEG's authorization, deviated from the established trading limits and took a trading position apparently designed to cause SEG to incur substantial losses (the "Position").

27. Specifically, Buendia engaged in the short sale[1] of 380,000 shares in the newly-issued Market Vectors China A Shares ETF ("PEK").

28. The total value of the Position was close to $16.5 million, exceeding the established trading limits by over 200 percent, or almost $11.5 million.

29. Buendia sold the shares short at an average price of $43.14 per share, even though, at the time of the sale, the trading market value of a PEK share was approximately $45.29.

---

[1] A "short sale" (or "shorting") is the sale of a security an investor borrows, but does not own, and the investor must, eventually, return the security to the owner.

30. Thus, even in the absence of any fluctuations in price of a PEK share, the Position caused SEG an immediate loss in the amount of approximately $817,000.

31. In addition, Buendia failed to hedge the Position, placing SEG at risk of incurring huge, potentially infinite losses.[2]

32. When the other SEG Members found out about the Position, they attempted to take remedial measures.

33. By then, however, the Position was not capable of being hedged, and SEG had no viable remedial alternatives.

34. When, on October 15, 2010, SEG closed the Position, SEG sustained a loss in the amount of $1,611,200.

35. On information and belief, Buendia took the Position with desire and intent to financially cripple SEG in order to hamper SEG's ability to work with China Bridge Capital ("CBC"), a Chinese investor that had expressed interest in investing substantial sums in SEG (see below).

### China Bridge Capital

36. CBC is a China-based financial company, focusing on fund management, real estate financing, cross border mergers and acquisitions, and investment banking.

37. In or about August, 2010, CBC expressed interest in investing in SEG ("CBC Opportunity").

38. Buendia and two of Buendia's Associates, James Faddy and Xiaodong Zhang, were assigned the task of negotiating with CBC on behalf of SEG.

---

[2] It is common knowledge in the industry that a short position that is not hedged exposes the investor to potentially infinite losses.

39. In or around late September 2010, Buendia negotiated a confidential Term Sheet with CBC, outlining the potential formation of a joint hedge fund entitled "CBC-SEG Capital," whose shareholders would be CBC and SEG.

40. According to the Term Sheet, CBC was to raise and invest $5 million for a fifty percent (50%) ownership interest in CBC-SEG Capital.

41. CBC's share in CBC-SEG Capital would increase to sixty-seven percent (67%) if the total assets raised by CBC were more than $10 million.

42. Buendia continued negotiating with CBC on behalf of SEG until early October 2010.

43. In or about early October 2010, unbeknownst to SEG, Buendia, Faddy and Zhang conspired to divert the CBC Opportunity to themselves.

44. Among other things, Buendia, Faddy and Zhang set up a competing business (the "Competing Company"), separate from SEG and proceeded to negotiate with CBC on behalf of Competing Company.

45. On information and belief, a new business entity was formed and registered with New York Department of State for purposes of operating the Competing Company.

46. On information and belief, Buendia and his coconspirators made numerous misrepresentations to CBC regarding SEG for the purpose of convincing CBC to invest in the Competing Company instead of SEG.

47. Buendia's theft of the CBC Opportunity is reflected on a "black-lined" version of the original CBC-SEG Capital Term Sheet, on which Buendia crossed out SEG's name and inserted "Xiaodong Zhang and his group."

### The Aftermath

48. Following October 14, 2010, when the other SEG Members were scrambling to assess the impact of the Position, respond to the investigative inquiries that flooded SEG as a result of the Position, and determine the future of the company, Buendia—who was still employed by SEG—continued to negotiate with CBC on behalf of the Competing Company.

49. While still employed by SEG, Buendia made arrangement to lease an office space for the Competing Company and conducted other work towards establishing the new venture with CBC.

50. In addition, Buendia accessed SEG's electronic mail system and deleted all sent and received emails pertaining to himself, Faddy and Zhang in both their electronic "SEG Capital" and "Compliance" folders through the month of October. He configured the computer system so that none of this information was available in archives.

51. On October 27, 2010 Buendia voluntarily resigned from SEG.

52. Contemporaneous with his resignation, Buendia presented SEG with a proposed option agreement for him to purchase of all of SEG's furniture, server and computer equipment in the near future.

53. Due to a significant reduction in its Trading Accounts, SEG ceased all operations on or about October 30, 2010. Buendia's conduct had killed the Company, as he knew it would.

### COUNT I
### (Breach of Contract)

54. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 52, as if fully set forth herein.

55. The Agreements are valid and enforceable contracts.

56. SEG performed all of SEG's obligations under the Agreements.

57. Buendia breached the Agreements by taking an unhedged Position with the total value greatly exceeding the trading limits set by SEG.

58. Buendia further breached the Agreements by failing to repay SEG the total monthly advances SEG paid to Buendia in 2010 towards his Net Trading Profits; Buendia did not earn any profit in 2010, so he was not entitled to retain the advances.

59. Buendia further breached the Agreements by failing to compensate the Trading Members that Buendia brought to SEG, and failing to reimburse SEG for the advances SEG made to the Trading Members.

60. As a result of the foregoing breaches, SEG suffered damages in an amount to be determined at trial.

## COUNT II
### (Breach of Fiduciary Duty)

61. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 52, as if fully set forth herein.

62. As a Member and employee of SEG, Buendia owed fiduciary duties to SEG, including a duty of care and loyalty.

63. Buendia breached his fiduciary duties of care and loyalty to SEG when on October 14, 2010 he undertook the unauthorized Position resulting in a loss of over $1.6 million to SEG.

64. Even to the extent that Buendia did not take the Position intentionally as averred above, at a minimum he did so negligently, violating his duty of care to SEG.

65. Buendia further breached his fiduciary duty of loyalty to SEG by stealing the CBC Opportunity from SEG.

66. As a consequence of Buendia's multiple breaches, SEG has been damaged in an amount to be determined at trial.

## COUNT III
### (Tortious Interference with Prospective Economic Advantage)

67. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 52, as if fully set forth herein.

68. SEG has an expectation that it would enter into a contract with CBC, whereby CBC would invest between $5 million and $10 million in SEF or buy a stock of SEG at a premium.

69. Buendia interfered with this business relationship by attempting to steal the CBC opportunity for the Competing Company.

70. The interference was accomplished by wrongful means, as detailed above.

71. In addition, on information and belief, given that Buendia had an extremely favorable contractual terms with SEG, it is evident that he engaged in the interference with the sole purpose of harming SEG.

72. As a result of Buendia's wrongful actions, SEG suffered damages in an amount to be determined at trial.

## COUNT IV
### (Unjust Enrichment)

73. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 52, as if fully set forth herein.

74. Buendia was enriched when he obtained $178,134 in advances from SEG.

75. Buendia was enriched at the expense of SEG.

76. Buendia was enriched under such circumstances that in equity and good conscience he should return the advances.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

    a.    Compensatory damages in an amount to be determined at trial, but in no event less than $178,134.00;

    b.    Punitive damages;

    c.    Prejudgment interest at the New York statutory rate of nine percent (9%);

    d.    Post-judgment interest;

    e.    An award of attorney's fees and costs; and

    f.    Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all issues so triable.

Dated: New York, New York
       January 29, 2015

                                      Brian C. Brook (BB 1980)
                                      CLINTON BROOK & PEED
                                      641 Lexington Avenue, 13th Floor
                                      New York, New York 10022
                                      Telephone: (212) 328-9559
                                      Facsimile: (212) 328-9560
                                      Brian@clintonbrook.com
                                      *Attorneys for Plaintiff Alexander Kaplin*