UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------X
                                          :
ALEXANDER KAPLIN,                         :
                                          :
                    Plaintiff,            :
                                          :
        -against-                         :
                                          :        15 Civ. 649 (PAC)
ANTHONY BUENDIA,                          :
                                          :
                    Defendant.            :        OPINION & ORDER
                                          :
                                          :
-----------------------------------------------------------X
```

The facts underlying this case occurred ten years ago, and litigation has been pending

nearly as long.  In October 2010, trader Anthony Buendia ("Buendia" or "Defendant") took a

losing short position (the "Position") on a newly-issued Chinese Exchange Traded Fund ("ETF")

called PEK, costing his employer SEG Capital, LLC ("SEG") significantly.  His alleged Position

was in excess of a $5 million trading limit SEG had imposed on Buendia.  SEG ceased trading

operations soon after, and, in December 2010, sued Buendia for breach of contract, breach of

fiduciary duty, and several other claims not relevant here.  The case wound its way through state

court until the parties stipulated to a discontinuance in 2012.  In 2014, SEG assigned its claims to

Alexander Kaplin ("Kaplin" or "Plaintiff"), who filed the instant case in 2015.

Over the course of the next four years, this Court dismissed one of Plaintiff's claims, and

Plaintiff withdrew two others.  In November 2019, Defendant moved for summary judgment on

(1) the issue of whether Defendant exceeded trading limits set by SEG; (2) Plaintiff's remaining

claims for (a) breach of contract (Count I) and (b) breach of fiduciary duty (Count II); and (3)

Plaintiff's request for punitive damages.

For the reasons discussed in detail below, Defendant's motion for summary judgment on the issue of whether Defendant exceeded trading limits SEG set is DENIED. Summary judgment on Counts I and II is GRANTED in part and DENIED in part. The Court defers ruling on Plaintiff's request for punitive damages, as explained below in Section E(2).

## BACKGROUND

### I.    Procedural Background

Unless otherwise indicated, the following facts are undisputed.[1] In December 2010, SEG sued Buendia in New York State court for breach of contract, breach of fiduciary duties, tortious interference with economic advantage, and unjust enrichment, all in connection with Buendia's taking of the Position. Am. Compl. ¶¶ 57–58, ECF No. 7. In October 2012, SEG and Buendia signed a stipulation discontinuing the action without prejudice. *Id.* at ¶ 64. In September 2014, SEG assigned to Kaplin all its claims and causes of action related to Buendia's conduct at SEG. *Id.* at ¶ 67.

Kaplin filed this action on January 29, 2015. Compl., ECF No. 1. His Amended Complaint contained four claims: (1) breach of contract based on Buendia taking an unauthorized trading position with intent to harm SEG and failing to reimburse SEG for advances to Buendia and his traders (Am. Compl. ¶¶ 68–75); (2) breach of the fiduciary duties of loyalty and care by taking an unauthorized trading position with intent to harm SEG and stealing the China Bridge Capital business opportunity (*id.* at ¶¶ 76–81); (3) tortious interference with prospective economic advantage (*id.* at ¶¶ 82–87); and (4) unjust enrichment by not repaying the advances SEG made to Buendia and his traders (*id.* at ¶¶ 88–92). Kaplin also seeks punitive

---

[1] Citations to the parties' motions and memoranda incorporate those documents' citations to the underlying documents in the record.

damages. *Id.* at ¶ 75.

In March 2015, Buendia moved to dismiss several of Kaplin's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). Kaplin thereafter voluntarily withdrew his claim for tortious interference. *See* Pl.'s Mem. Opp'n to Def's Mot. Dismiss 6, ECF No. 15. On November 24, 2015, this Court ruled that (i) Plaintiff's claim for breach of fiduciary duty had its genesis in the contractual relationship of the parties, and is thus subject to a six-year statute of limitations; (ii) the unjust enrichment claim was duplicative of the contract claim; and (iii) Plaintiff's allegations of "'willful, wanton and reckless misconduct,' if proven, would entitle Plaintiff to punitive damages." Op. & Order on Def.'s Mot. Dismiss 5, 6, 7, ECF No. 20. The Court then granted Defendant's motion to dismiss the unjust enrichment claim and denied Defendant's motion to dismiss the breach of fiduciary duty claim and punitive damages request. *Id.* at 7.

Discovery proceeded for the next several years, ending in October 2019. *See* Letter from Pl.'s Counsel dated Oct. 10, 2019, ECF No. 33. Thereafter, on November 27, 2019, Buendia moved for summary judgment on all remaining claims. Def.'s Mot. Summ. J. 1, ECF No. 36-1. In his memorandum of law in opposition to the motion, Kaplin voluntarily withdrew his claim for breach of fiduciary duty premised on Buendia's alleged misappropriation of the China Bridge Capital business opportunity.[2] Pl.'s Mem. Opp'n to Def's Mot. Summ. J. 14, ECF No. 42. What remains for this Court to determine are Kaplin's claims that Buendia (1) breached his contract by (a) taking an unauthorized position in excess of his trading limit, (b) failing to repay SEG the advances it gave him, and (c) failing to pay his Trading Members and to repay SEG for paying his Trading Members; (2) breached his fiduciary duties of (a) loyalty and (b) care by taking an

---

[2] Because Plaintiff has voluntarily withdrawn this business opportunity claim, the Court need not address Defendant's motion for summary judgment with respect to it.

unauthorized position in excess of his trading limit; and (3) owes punitive damages for (1) and (2).

## II.    Factual Background

<u>The Agreements</u>

In April 2009, when SEG hired him, Buendia and SEG entered into a Supplemental Trading Member Agreement ("STMA"), which (1) made Buendia a "Member" of SEG; (2) defined Buendia's duties as a "[T]rading [M]ember" of SEG; and (3) made Buendia "a party to the SEG Operating Agreement" ("OA"), binding him to all its terms and conditions as modified by the STMA. Pl.'s Reply to Def.'s Rule 56.1 Statement and Counterstatement of Material Facts ¶¶ 5, 6, ECF No. 41 ("Counterstatement"). The STMA and OA (collectively, the "Agreements") are the only binding agreements between SEG and Buendia, and thus constitute the contract at issue. *See id.* at ¶ 7. The parties agree that New York law applies to the Agreements. Op. & Order on Def.'s Mot. Dismiss 4.

<u>Buendia's Duties under the Agreements</u>

The STMA makes Buendia "responsible for establishing, building, operating and supervising a derivatives [sic] (including ETFs), proprietary trading/market making desk," which Buendia did during his time at SEG. Counterstatement ¶ 14. SEG gave Buendia the ability to control his trading account, subject to any restrictions imposed by the Managing Member and STMA. *Id.* at ¶ 15. The STMA required Buendia to refrain from acquiring a position "that involves Unacceptable Risk" absent "the express written consent of a Managing Member." *Id.* The OA defines "Unacceptable Risk" as a position that exceeds the STMA's risk parameters. [3]

---

[3] The parties have not stipulated that this fact is undisputed. Because the OA does in fact contain that definition, however, the Court finds that any dispute over this fact is not genuine.

Am. Compl. Ex. B 1.1., ECF 7-2 ("Ex. B"). In turn, the STMA states that blatant disregard for trading limits may result in Unacceptable Risk. Counterstatement ¶ 19.

Payments to Buendia and Other Trading Members

The STMA provides that, notwithstanding anything to the contrary, Buendia "will be entitled to a monthly advance against [his] future share of [his] Net Trading Profits in the amount of $10,000." Am. Compl. Ex. A 4(b), ECF 7-1 ("Ex. A"). The STMA also provides that the compensation of any Trading Members Buendia brings to SEG "shall be paid directly from [Buendia's] share of Net Trading Profits (Losses) as listed in Section 3(a)(ii) above." Ex. A 4(e). STMA 3(a)(ii) describes how Net Trading Profits are to be allocated between Buendia and SEG. It was SEG however, rather than Buendia, that compensated the other Trading Members. Counterstatement ¶ 31. The parties dispute whether SEG paid the other Trading Members from "Defendant's Account" or from SEG's own funds. *Id.*

Limitations of Liability

OA 6.3(a) provides that, except as provided in the STMA or the New York LLC law, "[a] Trading Member's liability will be limited to the value of his Capital Account." Ex. B at 6.3(a). The STMA states that Buendia "will not be allocated Net Trading Losses to the extent that [his] Capital Account would be reduced below $0." Ex. A 3(b). But STMA 4(d) provides that, notwithstanding anything in the STMA to the contrary, Buendia will bear 100% of the losses incurred on an Unacceptably Risky position.

Evidence of Trading Limits

The parties dispute whether a record exists of the Managing Member imposing a trading limit on Buendia. Counterstatement ¶ 21. Defendant contends there is no documentation of such a limit anywhere (Def.'s Mot. Summ. J. 36), while Plaintiff argues no writing is required (Pl.'s

Mem. Opp'n to Def's Mot. Summ. J. 6–7), that SEG Investing Members had weekly meetings with the Managing Member to establish trading limits (Counterstatement ¶ 21), and that Defendant's trading limit when he took the Position was $5 million (*id.*). Neither the OA nor the STMA impose any dollar limit on trades Buendia was permitted to make as a Trading Member. *Id.* at ¶ 18. The OA does not impose any requirement that a Trading Member hedge any position. *Id.* at ¶ 20. SEG's clearing broker imposed on SEG a risk measure known as a Risk Based Haircut, but Buendia never violated the Risk Based Haircut with any position he took, including the Position. *Id.* at ¶ 24. The parties dispute, however, whether SEG used the Risk Based Haircut to measure its own risk, or the measure was in place solely to protect SEG's clearing broker, making Buendia's compliance with it irrelevant for purposes of this lawsuit. *Id.* at ¶¶ 23, 25.

The record does not reveal any instance in which someone told Buendia that the Position constituted Unacceptable Risk. Buendia was exchanging chat messages with the Managing Member when he took the Position, and at no point in those messages did the Managing Member identify the Position as an Unacceptable Risk or instruct Buendia not to take the Position. *Id.* at ¶ 27. Indeed, prior to October 14, 2010, Buendia and other Trading Members had made "several" trades with a notional value over $5 million.[4] *Id.* at ¶ 22. And when Buendia took the Position, Plaintiff and other Members took the same position in PEK, albeit in smaller amounts. *Id.* at ¶ 28. After the Position was closed, the Managing Member terminated Buendia's ability to trade by written notice which did not identify the Position as an Unacceptable Risk. *Id.* at ¶ 29.

---

[4] "Notional value" is the number of shares in a position multiplied by their price. *See* Kaplin Depo. 79:6–11, ECF No. 38-1.

Loss That Position Incurred

The Position caused SEG a loss, the amount of which is disputed. Plaintiff alleges the loss was approximately $1.6 million (Am. Compl. ¶ 46); Defendant characterizes the loss as "significant" (Def.'s Mot. Summ. J. 9), but says he lacks information sufficient to form a belief as to whether the loss was in the amount Plaintiff alleges (Def.'s Answer to Am. Compl. ¶ 44, ECF No. 21). SEG had been profitable in 2009, the year before Defendant took the Position. Counterstatement ¶ 26.

## Decision Summary

Defendant moves for summary judgment on the issue of whether Defendant exceeded SEG's trading limits, Plaintiff's claims for breach of contract and breach of fiduciary duty, and Plaintiff's request for punitive damages. Summary judgment in Defendant's favor on the issue of whether Defendant exceeded SEG's trading limits is DENIED. Summary judgment in Defendant's favor on Plaintiff's claims for breach of contract and breach of fiduciary duty is GRANTED to the extent those claims are premised on Defendant's alleged negligence and DENIED to the extent those claims are predicated on Defendant's alleged willful acts, gross negligence, or reckless disregard for others' rights. The Court defers ruling on whether Plaintiff can maintain his claim to punitive damages, but will enter summary judgment in favor of Defendant if Plaintiff does not respond, as indicated below in Section E(2), within 10 days from the entry of this order, explaining why he is entitled to punitive damages despite his failure to provide any proof of public harm.

## DISCUSSION

### A. (1) Summary Judgment

A court may grant summary judgment where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(c). Summary judgment is mandated by Rule 56(c) where, "after adequate time for

discovery and upon motion," the non-moving party has "fail[ed] to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Additionally, Rule 56(f) allows the court to grant summary judgment on grounds not raised by a

party, provided that the court gives the parties "notice and a reasonable time to respond." Fed.

R. Civ. P. 56(f), (f)(2).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment; the requirement is that there be

no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48

(1986). "[T]he substantive law . . . identif[ies] which facts are material," and "[o]nly disputes

over facts that might affect the outcome of the suit under the governing law will properly prelude

the entry of summary judgment." *Id.* at 248. "[A] material fact is 'genuine' . . . if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If "the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is

no "genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

Thus, "a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat a

motion for summary judgment] . . . ." *Anderson*, 477 U.S. at 252.

In deciding whether a genuine dispute of material fact exists, the court will draw all

justifiable inferences in favor of the nonmovant. *Id.* at 255; *Matsushita*, 475 U.S. at 587. The

court will not make credibility determinations, as that is a jury function; instead, "[t]he evidence

of the non-movant is to be believed . . . ."  477 U.S. at 255.

### (2) Application to Issue of Whether Sufficient Evidence of Trade Limit Exists

Defendant requests summary judgment on the issue of "whether there is sufficient evidence to sustain the plaintiff's assertion that the defendant exceeded [SEG's] trading limits" (Def.'s Mot. Summ. J. 1, ECF No. 36-1), separately from summary judgment on Plaintiff's claims for breach of contract and breach of fiduciary duty, which are based on Defendant allegedly exceeding trade limits in taking the Position.  Therefore, the Court begins by addressing that issue, as a ruling in Defendant's favor would render summary judgment on Plaintiff's other claims moot.

The viability of Plaintiff's claims depends on the existence of a trading limit.  Plaintiff alleges that Defendant was subject to a trading limit of $5 million; that he was aware of this limit; and that he "violated the risk parameters" of STMA 4(d) by taking the Position in excess of his trading limit.  Pl.'s Mem. Opp'n to Def.'s Mot. Summ. J. 4, 5, 7, ECF No. 42.  In other words, Plaintiff contends that the Position was Unacceptably Risky because it exceeded $5 million, and that 100% of the loss from the Position should thus be allocated to Defendant.  *Id.* at 4.  Defendant argues that no such limit existed, and that the position was not Unacceptably Risky.  STMA 4(d) requires Defendant to adhere to trading limits "that the Managing Member [of SEG] may establish from time to time."  Contrary to Plaintiff's assertion, STMA 4(d) does *not* provide "that disregard of such limits will result in 'Unacceptable Risk.'"  *Id.*  Instead, STMA 4(d) says that *blatant* disregard of such limits *may* result in Unacceptable Risk, and that if a trade involving Unacceptable Risk results in a loss, 100% of the loss will be attributed to Defendant.

Plaintiff has established a genuine dispute over the material fact of whether a $5 million

9

trading limit existed. Dan Segal (SEG's Managing Member), Joe Lagrasta (an SEG Investing Member), and Plaintiff testified that the Managing Member and Investing Members held regular meetings to discuss risk. Counterstatement ¶ 47. Lagrasta and Plaintiff testified that the Members also set trading limits at these meetings. Lagrasta Aff. ¶ 16, ECF No. 43-8; Kaplin Depo. 138:9–18, ECF No. 43-1. Two witnesses support Plaintiff's claim that Defendant was subject to a $5 million trading limit in October 2010: Stanislav Finelt (an SEG Investing Member) represents that the limit was $5 million (Finelt Aff. ¶ 8, ECF No. 43-9), while Lagrasta says the limit was "below 10 million dollars." (Lagrasta Aff. ¶ 17, ECF No. 43-8). Contrary to Defendant's assertion, then, Lagrasta's and Finelt's affidavits are consistent rather than contradictory, although there is a gap between the two amounts. While the record reveals no documentation of a trading limit, it also reveals no requirement that trading limits be in writing. Accordingly, the testimony Plaintiff has provided is sufficient to defeat summary judgment on this issue. Plaintiff has also produced sufficient evidence that if the limit was $5 million, the Position exceeded the limit. *See* Segal Dep. 96:2–17, ECF No. 43-2.

The Court is not permitted to judge the credibility of witnesses when assessing the evidence on a motion for summary judgment. Accordingly, Defendant's protestations that Lagrasta's and Finelt's affidavits are "unsubstantiated" and "simply so incredible that no reasonable jury could find for the plaintiff based on them" (Def.'s Reply Memo. Supp. Mot. Summ. J. 5, ECF No. 46) are irrelevant. Defendant's commentary that the affidavits are "late blooming" and were executed "after fact discovery closed" and "after Defendant filed his Motion for Summary Judgment," apparently mentioned to cast doubt on the affidavits' veracity, are likewise irrelevant. *Id.* at 5, 12 n.8. The Court also does not consider Defendant's contention that Plaintiff's "own credibility on this issue is zero." *Id.* at 11. If the jury believes the

testimony Plaintiff has adduced, the Court cannot say that a finding for Plaintiff on this claim would be unreasonable as a matter of law. Therefore, construing all inferences in Plaintiff's favor, the Court finds that Plaintiff has produced evidence sufficient for a reasonable jury to find, by a preponderance of the evidence, that Defendant was subject to a $5 million trade limit in October 2010 and exceeded this limit in taking the Position. Summary judgment in Defendant's favor is therefore DENIED.

**B. (1) Contract Interpretation Generally Under New York Law**

Courts applying New York law are to give the words of a contract their plain meaning, interpreting the contract as a whole and endeavoring to give effect to its general purpose. *U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.*, 205 F. Supp. 3d 386, 412–413 (S.D.N.Y. 2016). Such a reading "should not render any portion [of the contract] meaningless." *Id.* at 413 (citation omitted). The court should construe the language to realize the parties' reasonable expectations. *Currier, McCabe & Assoc., Inc. v. Maher*, 906 N.Y.S.2d 129, 129 (N.Y. App. Div. 2010). Additionally, the court may not construe the language to add, subtract, or redefine terms; to do so would effectively write a new contract. *See UBS*, 205 F. Supp. 3d at 412; *see also DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 318 (S.D.N.Y. 2002) ("I may not re-write how the parties defined their rights and obligations, allocated their risks, and limited their liabilities and rights of recovery.").

Where the parties dispute the language's meaning, summary judgment is proper only if "the language of the contract is wholly unambiguous." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 257 (2d Cir. 2002) (citation omitted). Determining whether contract language is clear or ambiguous "is a question of law to be decided by the court." *Id.* The language is ambiguous if a reasonably intelligent person, having objectively examined the entire integrated agreement,

can see more than one meaning. *Id.* By contrast, the language is clear if it "has a definite and precise meaning" about which "there is no reasonable basis for a difference of opinion." *Id.* (citation omitted).

### (2) Liability-Limitation Provisions Under New York Law

Under New York law, parties may limit their liability to each other for harm their actions or omissions may cause. "New York courts have routinely enforced liability-limitation provisions when contracted by sophisticated parties, recognizing such clauses as a means of allocating economic risk in the event that a contract is not fully performed." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 138 (2d Cir. 2016). Federal courts in this district, interpreting New York law, have upheld liability-limitation provisions that exculpated the defendant from broad swaths of liability. *See TOA Sys., Inc. v. Int'l Bus. Machs. Corp.*, No. 18 CV 10685 (VB), 2019 WL 5693388, at *3 (S.D.N.Y. Nov. 4, 2019) (upholding provision barring liability for "any damages [including punitive damages] resulting from loss of . . . profits," regardless of theory of liability).

Not all liability can be exempted, however. Parties may exempt themselves from liability for negligence, but not for willful acts, gross negligence or a "reckless indifference to the rights of others." *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1370, 1371 n.3 (N.Y. 1992); *Baidu, Inc. v. Register.com, Inc.*, 760 F. Supp. 2d 312, 318 (S.D.N.Y. 2010).

The difference between ordinary negligence and gross negligence is that the latter requires an "act or omission of aggravated character." *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998) (citation omitted). To prove gross negligence, the plaintiff must show "that the defendant failed to 'exercise even slight care, scant care, or slight diligence'" (*Baidu*, 760 F. Supp. 2d at 318 (citation omitted)), or that the defendant's conduct displayed "a reckless

disregard for the rights of others" (*id.* (citation omitted)) or "'smacks' of intentional wrongdoing." *Am. Tel. & Tel. Co. v. City of New York*, 83 F.3d 549, 556 (2d Cir. 1996) (quoting *Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 611 N.E.2d 282, 284 (N.Y. 1993)).  Gross negligence differs from ordinary negligence in both kind and degree.  *Media Glow Dig., LLC v. Panasonic Corp. of N. Am.*, No. 16 CV 7907 (JFK), 2018 WL 2175550, at \*5 (S.D.N.Y. May 11, 2018).

### (3) Application

Here, the Court finds that (i) the contract language is wholly unambiguous in limiting Defendant's liability to the value of his Capital Account, and (ii) the liability-limitation provisions are valid.  Since the Defendant's Capital Account has been exhausted (*see* Def.'s Decl. ¶ 5, ECF No. 47; Def.'s 2010 IRS Form K-1, ECF No. 47-4 (reflecting forfeiture of Capital Account)), summary judgment in favor of Defendant is appropriate on Plaintiff's claims for breach of contract and breach of fiduciary duty to the extent the claims are premised on negligence.

Plaintiff has produced evidence sufficient to defeat summary judgment that Defendant acted with some level of culpability greater than negligence, however.  Specifically, Plaintiff has demonstrated that Defendant engaged in a variety of bad conduct leading up to October 14, 2010, including being evasive about his work (Lagrasta Aff., ECF 43-8, at ¶¶ 12–13) and keeping Investing Members "in the dark." (Kaplin Depo., ECF 43-1, at 128:24–25).  Plaintiff also points to evidence that Defendant intended to leave SEG prior to taking the Position (Counterstatement ¶ 59) and that he was aware of the alleged trade limit (Chat Messages Between Buendia and Zhang, ECF 43-11, at 2 ("[A] big position for us is $5,000,000")); Email from Buendia to Kaplin, ECF 43-10, at 3 (describing investment strategies and saying "limit to

a[t] most 5 ETFs with an overall notional amount of less than 5 million x 5 million"), all of which is circumstantial evidence tending to show that Defendant acted with some level of culpability greater than negligence. A reasonable jury could find as much, although the record contains contrary explanations, too. Therefore, summary judgment on the claims for breach of contract and breach of fiduciary duty is inappropriate to the extent that the claims are predicated on willful acts, gross negligence, or a reckless disregard for others' rights. The Court addresses each claim sequentially below.

### i.  Breach of Contract by Taking the Position

The Agreements unambiguously limit Defendant's liability to the value of his Capital Account, so the Plaintiff cannot recover damages from Defendant for taking the Position negligently. First, OA 6.3(a) provides that except as provided in the STMA or New York LLC law, Trade Members' (such as Defendant) liability will be limited to the value of their Capital Accounts. The LLC law does not impose any additional liability on Defendant, nor does it forbid this sort of liability limitation. Second, STMA 3(b) provides that SEG will not allocate Defendant any Net Trading Losses that would reduce his Capital Account below $0. STMA 4(d), however, states that, notwithstanding anything in the STMA to the contrary, Defendant will bear 100% of the losses incurred from an Unacceptably Risky position. STMA 4(d) may be construed in two possible ways, but only the first is reasonable. For the sake of clarity, the first interpretation may be called "Stop Loss," and the second, "Continue Loss."

Stop Loss reads OA 6.3(a) together with STMA 3(b) and 4(d) to limit Defendant's liability to the value of his Capital Account—to the point it reaches a balance of $0—and not hold the Defendant responsible for losses of any sort beyond zero. Thus, the "notwithstanding" language of STMA 4(d) means notwithstanding the ordinary method for dividing Net Trading

14

Losses between SEG and Defendant described in STMA 3(a), SEG will allocate 100% of the losses from Unacceptably Risky positions to Defendant. However, SEG will allocate those trading losses to Defendant only to the extent that they deplete his Capital Account, pursuant to STMA 3(b). Once his Capital Account hits $0, he will not incur any further liability for Unacceptably Risky trades, consistent with OA 6.3(a). Stop Loss is a consistent reading of all liability-limitation provisions in the Agreements.

Continue Loss, by contrast, reads STMA 4(d) to impose liability for Unacceptably Risky trades above and beyond the amount in Defendant's Capital Account. In other words, it abrogates the liability limitation of STMA 3(b) to read that notwithstanding the provision that SEG will not allocate Net Trading Losses to Defendant that take his Capital Account below $0, if he engages in an Unacceptably Risky trade, he will bear 100% of the losses from that trade— even the amount of the losses that takes his Capital Account below $0. Continue Loss is a consistent reading of STMA 3(b) and 4(d). The problem with Continue Loss is that it fails to account for OA 6.3(a). Rather than saying "notwithstanding anything to the contrary" or "notwithstanding anything to the contrary in either Agreement," STMA 4(d) says "notwithstanding anything to the contrary *in the Supplemental Trading Member Agreement*." Ex. B 4(d) (emphasis added). Thus, the "notwithstanding" language cannot modify language in the OA. As a result, there is no way to read STMA 4(d) as abrogating the limitation of liability in OA 6.3(a), which is the only way to make Continue Loss a reasonable interpretation.

Plaintiff would like the Court to solve this problem by reading OA 6.3(a) as limiting "Buendia's liability for trading losses only, and only the trading losses that were incurred in good faith and while exercising due care." Pl.'s Mem. Opp'n to Def.'s Mot. Summ. J. 17. Conveniently for Plaintiff, that construction would strip Defendant of OA 6.3(a)'s liability

limitation not only for taking the Position, but also for the advances he received and the money SEG paid other Trading Members. But OA 6.3(a) does not lend itself to that construction. Plaintiff's proposed construction invites the Court to add or at least redefine terms, which would effectively (and impermissibly) rewrite the contract. The Court declines to do so. Stop Loss gives the words of the contract their plain meaning, rendering none meaningless, after interpreting the contract as a whole and endeavoring to give effect to its general purpose. Continue Loss does not.

Stop Loss also effectuates the parties' reasonable expectations. Plaintiff argues it would not be reasonable to assume that after entrusting Defendant with millions of dollars and affording him "significant discretion" over his trading decisions, SEG would agree "to no remedy (or limited remedy) for Buendia's failure to perform his duties in good faith and to exercise due care." Pl.'s Mem. Opp'n to Def.'s Mot. Summ. J. 16. But if Defendant really was a highly-sought-after expert trader, as Plaintiff alleges (*see id.* at 7, 8, 20), SEG's decision to limit its remedies (by limiting Defendant's liability) in an effort to entice Defendant to accept employment with SEG would be eminently reasonable.

Moreover, SEG knew how to employ exceptional language to less thoroughly limit liability, as evidenced by OA 5.5, and did not apply such language to the liability-limitation provisions that apply to Defendant. OA 5.5 deals with liability and indemnification for the Managing Member, and begins by limiting his liability, "except as provided herein or in the LLC Law," to "the amount in his Capital Account." Ex. B 5.5(a). Then, it limits his right to indemnification for business actions and conduct undertaken on behalf of SEG to actions done in good faith. Ex. B 5.5(c). Finally, the OA reads that in the event SEG incurs any loss or expense as a result of *any* Member's obligations or liabilities unrelated to SEG's business, the Member

will reimburse SEG for all loss and expense incurred, and "[*t*]*his right to indemnification will not be limited by the amount in such Member's Capital Account*." Ex. B 5.5(f) (emphasis added). Thus, because SEG expressly removed liability limits for acts done by the Managing Member in bad faith and acts committed by any Member that are unrelated to the business, it becomes imminently clear that the Court cannot adopt Plaintiff's proposed interpretation to undercut OA 6.3(a)'s liability limitation, as OA 6.3(a) does *not* include such exceptional language.

The Agreements cannot limit Defendant's liability for willful acts, gross negligence or reckless disregard for others' rights, but they can (and do, by their clear terms) legally limit his liability for ordinary negligence. Plaintiff's argument that provisions claiming to limit liability for negligence "must be expressed in clear wording readily understandable as having such purport" (Pl.'s Mem. Opp'n to Def.'s Mot. Summ. J. 15) is well-taken. The Court, however, determines the Agreements comport with that requirement. Accordingly, the Agreements' liability-limitation provisions are valid, and they operate to limit Defendant's liability for alleged negligence and failure to exercise due care, because failure to exercise due care is synonymous with negligence. *See Axel Johnson, Inc. v. Arthur Andersen & Co.*, 738 F.Supp. 772, 775 (S.D.N.Y. 1990). Plaintiff's claims for breach of contract and breach of fiduciary duty are, therefore, subject to the liability-limitation provisions.

Because no reasonably intelligent person, having objectively examined the entire integrated agreement, can see more than one meaning in the Agreements' liability-limitation provisions, those provisions are unambiguous, and the Court may grant summary judgment as to them. Summary judgment on Plaintiff's claim that Defendant breached his fiduciary duty of care by negligently taking the Position is GRANTED in favor of Defendant. Likewise, to the extent that Plaintiff's claims for breach of contract and breach of the fiduciary duty of loyalty by taking

the Position are premised on negligence, summary judgment on those claims is GRANTED in favor of Defendant. But because there is a genuine issue of material fact regarding the culpability of Defendant's conduct and the Agreements' liability-limitation provisions cannot exculpate liability for willful acts, gross negligence, or reckless disregard for others' rights, summary judgment is DENIED to the extent these claims are predicated on such conduct.

### ii. Breach of Contract by Failing to Repay Advances

For essentially the same reason as set forth in the preceding section, the Court finds that the liability-limitation provisions here are also valid and unambiguous in the context of the entire contract.

The Agreements unambiguously limit Defendant's liability for not repaying the advances he received. STMA 4(b) says that notwithstanding anything to the contrary, Defendant is "entitled to a monthly advance against [his] future share of [his] Net Trading Profits in the amount of $10,000." Plaintiff correctly argues that neither Agreement defines the term "advance." Plaintiff is also correct in arguing that the plain meaning of the term "advance" implies a requirement to pay back the advanced funds. Pl.'s Mem. Opp'n to Def.'s Mot. Summ. J. 9. Plaintiff fails, however, to account for the phrase "against [his] future share of [his] Net Trading Profits," which signals *how* those advances are to be paid back. Consequently, Plaintiff's contention that "the intent [for] Buendia [to] return the payments if there were no trading profits was incorporated in the Agreement by virtue of the parties using the word 'advance'" lacks merit.

STMA 4(b) says that the advances are "against" Defendant's future share of his Net Trading Profits. In a fiscal year in which Defendant's Trading Account earned Net Trading Profits, those Profits would be divided between Defendant and SEG—thus, Defendant would have a share of Net Trading Profits, and the advances would be deducted from that share.

*Compare* Ex. A 3(a) *with* Ex. A 4(b). If instead Defendant's Trading Account incurred Net

Trading Losses, there would not, by definition, be any Net Trading Profits from which Plaintiff

can recover the advanced funds.

Moreover, even if the Court construes the unrepaid advances as "Net Trading Losses"[5]

which might be allocated to Defendant under STMA 3(b)(i), it would be unavailing, because

SEG cannot allocate Net Trading Losses to Defendant that reduce his Capital Account below $0,

which allocating these "losses" to Defendant would do.

Nor can Plaintiff prevail on this claim if the Court construes the unrepaid advances as Net

Operating Losses which might be allocated to Defendant as a Member under OA 4.2(c)(ii). Net

Operating Losses include all losses, fees, and expenses incurred by or chargeable against SEG

and directly related to SEG's business. Ex. B 1.1. Accordingly, if the advances were construed

as expenses incurred by SEG and related to its business, and if the relevant fiscal year resulted in

Net Operating Losses, the expense of the unrepaid advances might be allocated to Defendant.

*See* Ex. B 4.2(c)(ii). OA 4.2(e), however, provides that SEG will not allocate to any Member

Net Operating Losses that would reduce his Capital Account below $0, which this allocation

would do. And of course, OA 6.3(a) limits Defendant's liability to the value of his Capital

Account in any event.

Consequently, the unrepaid advances cannot be allocated to Defendant, because doing so

would take his Capital Account below $0, which the Agreements forbid regardless of how the

advances are characterized. And as Defendant points out, no separate provision exists in either

---

[5] The propriety of considering the unrepaid advances part of Net Trading Losses is dubious, as the advances appear to have been for Defendant's personal consumption rather than use in trading. *See* Def.'s 2010 IRS Form K-1, ECF No. 47-4 (categorizing the advances as guaranteed payments).

Agreement that allows SEG to "claw back" these advances.  Def.'s Mot. Summ. J. 38.

Therefore, because the language contained in the Agreements validly and unambiguously precludes Plaintiff's ability to recover on this claim to the extent it is predicated on negligence, summary judgment is GRANTED in favor of Defendant to the extent that his failure to repay SEG for the advances was negligent.  Summary judgment is DENIED to the extent that this claim is predicated on willful acts, gross negligence, or reckless disregard for others' rights.

### iii. Breach of Contract by Failing to Repay Monies Paid to Other Trading Members

Plaintiff has alleged two breaches with respect to this claim: that Defendant breached the Agreements by (1) failing to compensate other Trading Members and (2) failing to reimburse SEG for paying those Trading Members.  Am. Compl. ¶ 73.  Plaintiff, suing as assignee of SEG's rights, has no standing with respect to (1), because that alleged failure caused harm, if at all, only to the Trading Members.  (*See N.Y. State Citizens' Coal. for Children v. Poole*, 922 F.3d 69, 75 (2d Cir. 2019) (a plaintiff asserting the rights of others faces a "rule of prudential standing: the so-called third-party standing bar. . . . [T]his rule prevents 'litigants from asserting the rights or legal interests of others [simply] to obtain relief from injury to themselves.'").[6] SEG was harmed only insomuch as it paid the Trading Members without receiving reimbursement from Defendant, which is the basis of (2).  Because Plaintiff lacks standing to bring claim (1), summary judgment with respect to (1) is GRANTED in favor of Defendant. Claim (2) is addressed below.

As with Plaintiff's other claims for breach of contract, the Agreements validly and unambiguously limit Defendant's liability for not reimbursing SEG the monies it paid Trading

---

[6] The exception does not apply here, because Plaintiff has not shown a barrier to the Trading Members' ability to assert their own interests.  *See Poole*, 922 F.3d at 75.

Members.  According to STMA 4(e), "the compensation [of] any other Trading Member that [Defendant] may bring to [SEG] . . . shall be paid directly from [his] share of Net Trading Profits (Losses)."  Unlike the provision regarding advances to Defendant, then, 4(e) implies that this money is to come from Defendant's share of the Net Trading Profits *or* be included in his share of the Net Trading Losses, as the case may be.  The liability-limitation provisions discussed above remain intact.

SEG allegedly paid $78,134 to Trading Members that Defendant brought to SEG.  Pl.'s Mem. Opp'n to Def.'s Mot. Summ. J. 2.  Assuming this money was not paid out of Defendant's account, Defendant would remain responsible for these payments even if his Trading Account incurred Net Trading Losses.  As discussed above, however, Net Trading Losses and Net Operating Losses cannot be allocated to Defendant to the extent that doing so would reduce his Capital Account below $0, and allocating these payments to Defendant would take his Capital Account below $0.  As in the case of advances to Defendant, the Agreements contain no clawback provision regarding these funds, either.  Accordingly, the Agreements' liability-limitation provisions limit Defendant's liability for these payments (to the extent his conduct was negligent) to the value of his Capital Account, which has been exhausted.  Plaintiff therefore cannot recover these payments unless Defendant's failure to reimburse SEG was willful, grossly negligent, or exhibited a reckless disregard for others' rights.

Accordingly, summary judgment on Plaintiff's claim for failure to reimburse SEG for payments made to other Trading Members is GRANTED in favor of Defendant to the extent that it is premised on Defendant's alleged negligence.  Summary judgment is DENIED to the extent that this claim is predicated on willful acts, gross negligence, or reckless disregard for others' rights.

### C.  (1) Implied Covenant of Good Faith and Fair Dealing Under New York Law

New York law implies a covenant of good faith and fair dealing in all contracts. *Negrete*, 187 F. Supp. 3d at 470. This implied covenant "does not independently create additional duties extraneous to the parties' agreements." *Id.* Instead, the covenant requires the parties to refrain from acting in ways that destroy or injure the other party's right to receive the benefit of his bargain under the contract. *Royal Dispatch Servs., Inc. v. UBS Fin. Servs., Inc.*, No. 12 CV 2032, 2012 WL 3113291, at *4 (E.D.N.Y. July 31, 2012).

### (2) Application

The Court finds that the Agreements contain an implied covenant of good faith and fair dealing pursuant to New York law. Plaintiff has produced evidence sufficient for a reasonable jury to find that (i) Defendant failed to conduct proper due diligence before taking the Position; (ii) that failure was contrary to industry norms and practices; and (iii) that failure constituted a breach of the duty of good faith and fair dealing. *See* Expert Report of Christopher Romano, ECF 43 (ex. 6) at 2, 6, 8.

Given the Agreements' liability-limitation provisions, summary judgment on Plaintiff's claim for breach of the covenant of good faith and fair dealing is GRANTED in favor of Defendant to the extent that it is premised on Defendant's alleged negligence. Summary judgment on this claim is DENIED to the extent that the claim is predicated on willful acts, gross negligence, or reckless disregard for others' rights.

### D.  Statute of Limitations for Breach of Fiduciary Duty Claims Under New York Law

In its November 24, 2015 order on the Defendant's motion to dismiss, this Court held that, pursuant to *Sears, Roebuck & Co. v. Enco Assoc.*, 43 N.Y.2d 389, 396 (1977), a six-year

statute of limitations applies to Plaintiff's claim for breach of fiduciary duty, as the claim had its genesis in the parties' contractual relationship.  Op. & Order on Def.'s Mot. Dismiss 5.  The Court drew this conclusion because the Agreements between the parties created the fiduciary duties Defendant owed to SEG.[7]  Upon reviewing the record and the case law on this subject, the Court sees no reason to disturb its prior ruling on this issue.  Accordingly, a six-year statute of limitations applies to Plaintiff's claim for breach of fiduciary duty, and the Court will not address this argument further.

Accordingly, Defendant's motion for summary judgment on Plaintiff's claim for breach of fiduciary duty on the grounds that it is time-barred is DENIED.  This claim may go forward, consistent with the ruling in Section B(3)(i) *supra*.

### E.  (1) Punitive Damages Under New York Law

Where a plaintiff's claim arises from (or "has its genesis in") the parties' contractual relationship, New York law requires the plaintiff to plead that (1) the defendant's conduct is "actionable as an independent tort"; (2) the tortious conduct is "'gross' and 'morally reprehensible,' and 'of such wanton dishonesty as to imply a criminal indifference to civil obligations,'"; (3) the "egregious conduct" is "directed to plaintiff"; and (4) the conduct is "part of a pattern directed at the public generally." *N.Y. Univ. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 767 (N.Y. 1995); *see also Rocanova v. Equitable Life Assurance Soc'y of U.S.*, 634 N.E.2d 940, 943–44 (N.Y. 1994); *Topps Co., Inc. v. Cadbury Stani S.A.I.C..* 380 F. Supp. 2d 250, 263–64 (S.D.N.Y. 2005).  (4) is known as the "public wrong" requirement. *Topps*, 380 F. Supp. 2d at

---

[7] The Agreements make Buendia a member of SEG, and New York's LLC law then imposes fiduciary duties on him as a member of the LLC. *Weidberg v. Barnett*, 752 F. Supp. 2d 301, 307 (S.D.N.Y. 2010); *DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 438 (S.D.N.Y. 2010).  These fiduciary duties include the duties of loyalty and care. *See DirecTV*, 691 F. Supp. 2d at 438–39.

262.  Consequently, punitive damages for a breach of contract will be recoverable only "if necessary to vindicate a public right" because the conduct was aimed at the public.  *N.Y. Univ.*, 662 N.E.2d at 767; *see also Rocanova*, 634 N.E.2d at 943.  By contrast, if the claim is unrelated to the parties' contractual relationship, "no showing of a public wrong is required." *Topps*, 380 F. Supp. 2d at 264.

   The Second Circuit has rejected the argument "that punitive damages might be available on a contract claim[] absent conduct directed at the public," recognizing that the cases in favor of such a position cited a pre-*N.Y. University* Court of Appeals case and did not even discuss "the public aim requirement." *TVT Records v. Def Jam Music Grp.*, 412 F.3d 82, 93–94 (2d Cir. 2005).  The *TVT* Court remarked (i) that *N.Y. University* and *Rocanova* make clear that the public wrong requirement exists, (ii) the Court of Appeals has not changed that requirement, and (iii) the (*TVT*) Court "h[as] no reason to question its continued vitality." *Id.* at 94.  Moreover, the Second Circuit "has not wavered in applying the public aim requirement since *Rocanova* was issued." *Id.* at 94 n.12 (citing *N.Y. Marine & Gen. Life Ins. Co. v. Tradeline LLC*, 266 F.3d 112, 130 (2d Cir. 2001) (rejecting punitive damages claim for breach of contract in bad faith because plaintiff failed to allege defendant's conduct was aimed at the public generally); *United States v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 160–61 (2d Cir. 1996) (rejecting punitive damages claim for failure to show public harm)).  Thus, "[t]o the extent that some courts have found meeting the 'public harm' requirement unnecessary, the Second Circuit (whose rulings bind this court) has concluded that they are against the weight of the authority on the issue." *Mayline Enters., Inc. v. Milea Truck Sales Corp.*, 641 F. Supp. 2d 304, 311 (S.D.N.Y. 2009) (citing *TVT Records*, 412 F.3d at 94 & n.12).  Finally, any argument "that public rights are implicated in [a breach of contract] case because of the public's interest in the sanctity of contracts" is

24

unavailing, "because if that were the law[,] punitive damages would be available in virtually every breach of contract case." *Merritt Meridian*, 95 F.3d at 160 n.3.  Instead, "punitive damages are an 'extraordinary remedy.'" *Pinnacle Info. Sys. v. W. Clearing Corp.*, No. 11 CV 5092 (NRB), 2011 WL 3586433, at *1 (S.D.N.Y. Aug. 4, 2011) (quoting *Rocanova*, 634 N.E.2d at 943–44).

### (2) Application

There is no dispute that Plaintiff's claims have their origins in the parties' contractual relationship.  Plaintiff is, accordingly, required to demonstrate that Defendant's conduct involved public wrong, if the Court is to award punitive damages.  Absent the parties' Agreements, there is no evidence that Defendant "owed Plaintiff any duty under tort law to conduct [his] activities non-negligently." *Mindset Ltd. v. Quality Controlled Biochemicals, Inc.*, No. 99 CV 6070 (AGS), 2000 WL 28167, at *2 (S.D.N.Y. Jan.14, 2000).  The Agreements specify Defendant's duties and limitations; apart from the Agreements, Defendant had no duty to provide services to SEG, and Plaintiff would have no claim against Defendant for taking the Position in alleged violation of his Agreements-imposed trading limit.  Likewise, as discussed above, Plaintiff's claim for breach of fiduciary duties has its source in the contract because the contract imposes those duties upon Defendant and Plaintiff is claiming that he breached them by violating provisions of the contract.  Therefore, Plaintiff's claims all have their origins in the parties' contractual relationship, and proof of public wrong is required to impose punitive damages.

Plaintiff has not alleged (much less provided proof sufficient to defeat summary judgment) that Defendant's conduct caused a public harm or was aimed at the public generally.  Instead, this appears to be a purely private dispute over conduct allegedly in breach of contract and fiduciary duties.  Because the record displays a complete absence of proof of public wrong,

the Court need not address whether the conduct underlying the claims constituted independent torts, was egregious, or was directed to Plaintiff. Because the Plaintiff has failed to present any proof of the public wrong requirement, Plaintiff cannot obtain the extraordinary remedy of punitive damages for any of his claims. *See Mortg. Servicing, LLC v. JPMorgan Chase Bank, N.A.*, No. 15 CV 293-LTS-RWL, 2019 WL 4735387, at *9 (S.D.N.Y. Sept. 27, 2019) ("Among other issues, Plaintiffs cite no specific evidence, and the Court can find none in the record . . . , from which a reasonable juror could infer that [defendant]'s conduct was directed at the public generally. Accordingly, . . . partial summary judgment is granted to the extent that it seeks dismissal of Plaintiffs' claim for punitive damages."). Defendant did not raise this ground for summary judgment, but the Court may nonetheless grant summary judgment on this ground "[a]fter giving [Plaintiff] notice and a reasonable time to respond." Fed. R. Civ. P. 56(f), (f)(2). Accordingly, the Court defers ruling on the issue of whether Defendant is entitled to summary judgment regarding Plaintiff's ability to recover punitive damages. Plaintiff is on notice that the Court considers Plaintiff's failure to provide proof of public harm a ground for awarding Defendant summary judgment. Plaintiff has ten (10) days from the entry of this order to respond; if he does not, the Court will enter summary judgment on that basis.

## CONCLUSION

The Court DENIES Defendant summary judgment on (1) the issue of whether Defendant exceeded SEG's trading limits; (2) Plaintiff's breach of contract claims to the extent they are predicated on Defendant's alleged willful acts, gross negligence, or reckless disregard for others' rights; and (3) Plaintiff's breach of fiduciary duty claims to the extent they are founded on Defendant's alleged willful acts, gross negligence, or reckless disregard for others' rights.  The Court GRANTS Defendant summary judgment on (1) Plaintiff's breach of contract claims to the extent they are based on Defendant's alleged negligence; and (2) Plaintiff's breach of fiduciary duty claims to the extent they are predicated on Defendant's alleged negligence.  The Court reserves ruling on the issue of whether Plaintiff can maintain his claim for punitive damages; if Plaintiff does not respond within ten (10) days from the entry of this order, the Court will enter summary judgment in favor of Defendant on the ground that Plaintiff has not shown any evidence of public harm, and therefore is not entitled to punitive damages as a matter of law.

Dated: New York, New York
April 14, 2021

SO ORDERED

HONORABLE PAUL A. CROTTY
United States District Judge